```
1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS
2

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5   v.                               )  No. 3:20-cr-30101-1
                                     )  East St. Louis, Illinois
6   VALLIE FRANCIS ZELLER,           )
                                     )  SENTENCING PROCEEDINGS
7              Defendant.            )

8

9                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
10           UNITED STATES CHIEF DISTRICT JUDGE

11                   SEPTEMBER 13, 2023

12

13

14

15

16

17

18

19

20
              Stephanie Rennegarbe, RDR, CRR, CBC
21                 IL CSR #084-003232
                    750 Missouri Avenue
22            East St. Louis, IL  62201
                    618-482-9226
23        Stephanie_Rennegarbe@ilsd.uscourts.gov

24      Proceedings recorded by mechanical stenography;
         transcript produced by computer-aided transcription
25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:      Alexandria M. Burns, Esq.
                             Zoe Jean Gross, Esq.
 3                           Assistant United States Attorney
                             #9 Executive Drive, Suite 300
 4                           Fairview Heights, IL  62208
                             618-628-3700
 5                           alexandria.burns@usdoj.gov
                             Zoe.Gross@usdoj.gov
 6

 7   FOR THE DEFENDANT:      Vallie Francis Zeller (Pro Se)

 8                           Current Housing Address:
                             Pekin FCI
 9                           P.O. Box 5000
                             Pekin, IL  61555
10

11   PROBATION OFFICER:      Katie Freeman, USPO

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  ***********************

2          COURTROOM DEPUTY:  The matter of *United States of*

3  *America v. Vallie Francis Zeller,* case #20-cr-30101, is called

4  for Sentencing.

5          Will the parties please identify themselves for the

6  record?

7          MS. BURNS:  Good morning.  Ali Burns on behalf of the

8  United States.

9          MS. GROSS:  And Zoe Gross.  Good morning, Your Honor.

10          THE COURT:  Good morning, Counsel.

11          DEFT. ZELLER:  Good morning.  Vallie Zeller.

12          THE COURT:  Good morning, Mr. Zeller.

13          DEFT. ZELLER:  Good morning.

14          THE COURT:  Now, this matter is before the Court

15  today for sentencing.

16          Mr. Zeller, you had previously had counsel at trial

17  and during the presentence interview and you told me you

18  wanted to discharge your Counsel.  I encouraged you to have

19  standby counsel for sentencing.  At that point that's all that

20  was left was sentencing.  And then you agreed to have Mr.

21  Campanella as your standby counsel and then later said that

22  you preferred to proceed *pro se.*

23          So, you are proceeding today representing yourself,

24  so a few ground rules.

25          There will be times -- Most of the time I will ask

 1    you, when it's your turn, to make an argument that you would

 2    make as your own counsel, similar to what I will ask the

 3    Government for an argument and then I will ask you for an

 4    argument.

 5            And then, because you are the Defendant, you have an

 6    absolute right to an allocution, and at that point you can say

 7    anything that you wish to say in mitigation on your own

 8    behalf.  But, you are not going to talk over me.  Ms. Burns

 9    doesn't get to talk over me, you don't get to talk over me,

10    and I will tell you when it's your turn to speak.

11            So, now, I will just note, as I always do, start with

12    the basis for the conviction in this case.  Mr. Zeller was

13    found guilty by a jury on March 30th of this year, following a

14    trial, to three counts.

15            Count 1 charged Attempted Enticement of a Minor, in

16    violation of 18 United States Code 2422(b).

17            Count 2 charged Interstate Travel with Intent to

18    Engage in Illicit Sexual Conduct, in violation of 18 United

19    States Code 2423(b).

20            And, Count 3 charged Attempted Production of Child

21    Pornography, in violation of 18 U.S.C. 2251(a) and 2251(e).

22            Now, I always start by going over what I have

23    reviewed in preparation for the sentencing.

24            Before Counsel was discharged, Counsel filed

25    objections to the report, to the presentence report at

1    Document 176.  The Government filed a response to those

2    objections at Document 177.  Mr. Zeller filed *pro se*

3    objections to the report after counsel was discharged.  That's

4    at Document 209.  Probation responded to both sets of

5    objections in a Revised Addendum filed at Document 221.  The

6    Government filed sentencing memos at Documents 181 and 183.

7    Document 181 contains a number of exhibits.

8         And then the Counsel, before discharged from Mr.

9    Zeller, filed sentencing memos at Documents 178 and 179.

10   Yesterday there was a letter from a victim in a different case

11   in Florida filed at Document 227.

12        Now, the presentence report was initially disclosed

13   on June 13 of 2023, and revised on July 11th, at Document 198.

14        Now, I will note there have been a number of filings

15   from Mr. Zeller on his own behalf.  Each of those up until

16   this point have been addressed in an order, and the record

17   will reflect those filings, as well as the Court's ruling.

18        So, Ms. Burns, anything that I have overlooked with

19   respect to the filings?

20        MS. BURNS:  I don't believe so, Your Honor.

21        THE COURT:  Mr. Zeller, do you think there's anything

22   I have overlooked?

23        DEFT. ZELLER:  I put in a motion for a change of

24   venue.

25        THE COURT:  Okay.  I got an order out on that.  That

1    was denied.  You should have received an order on that.  But,

2    again, it is part of the record, both your motion and the --

3            DEFT. ZELLER:  And there's also the subpoenas.

4            THE COURT:  Everything you filed is in the record.

5            DEFT. ZELLER:  Okay.

6            THE COURT:  So, as I said, there were objections

7    filed to the presentence report, so I'm going to next take

8    those up.

9            As I said, they were addressed by Probation in the

10   revised addendum filed at Document 221, and I don't need any

11   further argument on this.  Again, Counsel filed objections,

12   Mr. Zeller filed *pro se* objections, and the Government

13   responded.

14           So, going first to the objections filed by Counsel,

15   I'm still going to consider those.  That's Objections 1, 2, 3,

16   and 4.  That is an objection to paragraphs 7 through 13 which

17   address offense conduct; paragraphs 19 through 29, which are

18   the guideline calculations; paragraphs 82 and 83, which are

19   now 83 and 84, that is the statutory guideline custody

20   provisions; and paragraphs 85 through 89, now 86 through 90,

21   because of changes in the presentence report, that is the

22   statutory guidelines of supervised release and Probation

23   provisions.  The Defendant -- again, this is one filed through

24   counsel -- objected to these paragraphs as he maintains his

25   innocence and intends to appeal his guilty verdict.

1             So, again, a jury found Mr. Zeller guilty of the

2    crimes, the three counts that I mentioned earlier.  Discovery

3    materials were provided by the Government and presented at

4    trial, so I note Mr. Zeller's continued assertion of

5    innocence, but I find no changes need to be made to the

6    presentence report.  Essentially he's objecting to all the

7    relevant conduct, and that can be his claim of -- his claim of

8    innocence can be addressed on appeal, so I will adopt the

9    probation officer's position on those first four objections.

10            Objection #5 goes to paragraphs 124 and 125, now 125

11   and 126, of the presentence report which outline factors that

12   may warrant a departure or a variance from the guideline

13   range.  Again, he asserts there are factors that warrant a

14   sentence outside the guideline range.  So, this is the

15   probation officer's position:  That, first, Mr. Zeller didn't

16   specify any particular facts or factors supporting a departure

17   or variance for this offense.  The probation officer didn't

18   find that there was.  Of course, that's always something that

19   can be argued by the Defense.

20            Paragraph 126 of the presentence report specifically

21   outlines the 3553(a) factors that the Court may consider in

22   determining what is an appropriate sentence.  So, I will adopt

23   the probation officer's position on that objection, as well,

24   and no changes will be made to the presentence report.

25            Now, before I forget, I am going to ask the probation

 1    officer to revise the report to reflect that Mr. Zeller

 2    elected to proceed *pro se* at sentencing, but it can also

 3    disclose who trial counsel was.

 4         So, Probation did make a revision to the initial

 5    presentence report.  Paragraph 30 was added to include offense

 6    behavior not part of relevant conduct after the Government

 7    provided information concerning Mr. Zeller's correspondence

 8    with a 16-year-old girl in 2019, which was sexual in nature,

 9    and because of that paragraph 27 was revised to include

10    information about that conduct.  Minor revisions were made to

11    paragraph 34 and 66.

12         Now, on July 31st, Mr. Zeller filed *pro se* objections

13    to the presentence report at Document 209.

14         Objection #6 goes to paragraphs 27 and 30 of the

15    presentence report which outlines information found on his

16    cell phone during the instant offense.  Mr. Zeller would like

17    this information to be omitted from the report.  He asserted

18    that the alleged conversation was with a reported 16-year-old

19    female.  No charges were filed.

20         So, I note the information contained in paragraphs 27

21    and 30 was provided by the Government and located on Mr.

22    Zeller's cell phone after his arrest.  That conduct is almost

23    identical to the conduct in this case and speaks to a pattern

24    of activity.  Under Guideline 4B1.5, the comment to that notes

25    that an occasion of prohibited sexual conduct may be

1    considered for purposes of Subsection B without regard to

2    whether the occasions occurred during the course of the

3    instant offense or resulted in a conviction for the conduct

4    that occurred on the occasion, and there is simply no

5    information to support his claim that the minor female in

6    paragraph 30 was a chatbot.  So, I will adopt the probation

7    officer's position on that objection.  It is noted, but no

8    changes will be made to the presentence report.

9           Now, in Objection #7, Mr. Zeller, *pro se*, reiterated

10   his objection that was previously filed by Counsel to

11   paragraphs 125 and 126, because the initial objections filed

12   by Counsel were not very specific or any factors to support

13   objection, and he noted that he filed objections while

14   represented by Counsel that outlines specific factors

15   supporting them.  That's at Document 192.

16          So, again, the probation officer maintains her

17   response to Objection #5 with regard to those paragraphs, and

18   so those will -- for the reasons stated on Objection #5, no

19   changes will be made.  I will adopt the probation officer's

20   position on that -- on Objection #7.

21          Now, #8, Mr. Zeller wanted to note an omission in

22   paragraphs 82 and 83 specifically in quote, line 7 of the

23   paragraph, after Kimbrough, citing it should reflect on the

24   next line, paragraphs 125 and 126, "In imposing a sentence,

25   please make an -- please review and make note of the omission

1    and add the correction in Document 192."

2              So, the probation officer believes that Mr. Zeller

3    wanted to note an omission in paragraphs 83 and 84, which

4    concern custody.  The presentence report has been

5    appropriately construed.  Of course, the Court is aware that

6    it on its own may consider a departure or variance from the

7    guideline calculations as I consider each of the 3553(a)

8    factors.  So, I will adopt the probation officer's position on

9    that, which is the final objection.

10              So, ruling on the objections is noted and I will

11   otherwise adopt the presentence report.

12              Now, Mr. Zeller, I want to ask you -- and that is you

13   as yourself, not as you as your lawyer -- But you filed

14   objections to it, so I assume that you read and discussed the

15   Presentence Investigation Report, both the original and the

16   revised?

17              DEFT. ZELLER:  Yes, ma'am.

18              THE COURT:  I say *discussed*.  So you read it

19   yourself, correct?

20              DEFT. ZELLER:  Yes, ma'am.

21              THE COURT:  And did you discuss it with Mr.

22   Campanella at the time when he was your attorney?

23              DEFT. ZELLER:  Somewhat.

24              THE COURT:  Okay.  Have you had enough time to review

25   and discuss the presentence report?

```
 1              DEFT. ZELLER:  Have I --

 2              THE COURT:  Have you had enough time to review it?

 3              DEFT. ZELLER:  To review it, yes.

 4              THE COURT:  Okay.  Did you also review within that

 5    report the Proposed Terms and Conditions of Supervised

 6    Release?

 7              DEFT. ZELLER:  Yes, I believe so.

 8              THE COURT:  Okay.  And I note, as I said, you are

 9    maintaining your innocence and plan to appeal the conviction,

10    so we are not talking about the offense conduct which you have

11    objected to.  But, was everything in the report about your

12    background correct?

13              DEFT. ZELLER:  For the most part.  There was some

14    things that Campanella didn't make me aware of that I should

15    say, like the fact that I was diagnosed -- well, not

16    diagnosed, but I had ADD and I was in like slower classes and

17    things like that when I was younger.  So, there's some things

18    like that that was never put in there.  He didn't prepare me

19    when I met with Ms. Freeman.  That's why I asked to have

20    another one.  Like he just came in and said, "All you need to

21    talk about is upbringing."  And when I researched it, I found

22    out when you are a sex offender upbringing means absolutely

23    nothing, you can't even get a departure on that.  So, that's

24    why I was upset about that.

25              THE COURT:  Well, I will give you a chance, at any
```

1  point, either wearing your self-representation hat or in your

2  allocution to point out anything like that about your history,

3  education, or anything like that, okay?

4      DEFT. ZELLER:  Yes, ma'am, I appreciate it.

5      THE COURT:  Okay.  So, I next want to review the

6  statutory sentencing options and the guideline calculations as

7  set forth by the probation office.

8      So, Count 1 calls for a minimum term of imprisonment

9  of ten years, up to life; Count 2 has a maximum of 30 years;

10 Count 3 calls for a minimum term of 15 years imprisonment and

11 has a maximum of 30.  Each of Counts 1, 2, and 3 have a

12 statutory provision of five years to life of supervised

13 release.  There's a maximum fine on each count of $250,000,

14 and a special assessment is mandatory on each felony count.

15     So, as calculated by Probation, the total offense

16 level is 41.  Mr. Zeller's criminal history is a Category I as

17 he has zero points.  That produces on Count 1 an advisory

18 guideline range of 324 to 405 months; Counts 2 and 3, it's 324

19 to 360 months simply because of the statutory maximum on those

20 two counts.  Supervised release range is the same as the

21 statute, five years to life on each count.  The advisory fine

22 range is $5,000 to $250,000; and, again, the mandatory special

23 assessment.

24     Now, I note that the Government also sought

25 forfeiture of the phone in this case, and a preliminary order

1    of forfeiture was entered on Monday at Document 229.

2         Now, I note in addition to the ordinary special

3    assessment, the statute calls for an assessment of $5,000 on

4    any non-indigent person or entity convicted of sexual

5    exploitation and other abuse of children, but Mr. Zeller

6    appears to be indigent and does not have the ability to pay

7    that $5,000 special assessment, so it will not be assessed.

8         Ms. Burns, any objection regarding what I have stated

9    with respect to the statute or the advisory guideline range?

10        MS. BURNS:  No, Your Honor.

11        THE COURT:  Mr. Zeller, any objection?

12        DEFT. ZELLER:  I don't wish to forfeit my phones.

13        THE COURT:  Okay.  Well, that's something you can

14   take up, as well.  But, as to what I said with respect to the

15   statute and the guidelines, do you agree that that's what the

16   PSR says?

17        DEFT. ZELLER:  Yes, that's what I read, for the most

18   part.

19        THE COURT:  Okay.  Well, after calculating the

20   guideline range I must consider the relevant factors set out

21   by Congress at 18 United States Code 3553(a), and ensure that

22   I impose a sentence that is sufficient but not greater than

23   necessary to comply with the purposes of sentencing.  Of

24   course, these purposes include the need for the sentence

25   imposed to reflect the seriousness of the crime, to promote

respect for the law, and to provide just punishment for the

offense.  The sentence should also deter criminal conduct that

is both specific to Mr. Zeller and generally to the public, to

protect the public from further crimes by Mr. Zeller, and

promote rehabilitation.

Now, I have to consider the sentencing guidelines and

any relevant policy statements, but I also must consider the

nature and circumstances of these offenses, Mr. Zeller's

history and characteristics, and, of course, strive to avoid

unwarranted sentence disparities among similarly-situated

Defendants.

So, I have considered the information in the

presentence report, as well as the entire record and

considered it in relation to those statutory factors.  I'm now

going to review what I see as the nature and circumstances of

the offense, Mr. Zeller's history and characteristics and, at

the end, once I decide what sentence will be imposed, I will

explain the reasons for that, and if anyone wants me to

explain more, please let me know before the hearing ends

today.

Now, looking first at the nature and circumstances of

the offense, Mr. Zeller was found guilty, as I said earlier,

of Attempted Enticement of a Minor, Interstate Travel With

Intent to Engage in Illicit Sexual Conduct, and Attempted

Production of Child Pornography.  His conduct involved

attempting to engage in sexual activity with a purported

15-year-old minor female after corresponding with her via a

dating application.  He traveled from St. Louis, Missouri to

Illinois to engage in the sexual activity after instructing

her to produce a video of her genitalia.  Additionally, he had

prior sexual intercourse with minors on three separate

occasions when he was approximately 21 years old.

Now, Mr. Zeller went to trial, which was his absolute

right to do so, so he did not receive any reduction for

acceptance of responsibility and, of course, that's

appropriate, because he most definitely has not demonstrated

any acceptance of responsibility whatsoever for this

conviction.

So, as calculated by Probation, the base offense

level is a 32.  That's for the conviction under 18 U.S.C.

2251(a), then two levels are added because the offense

involved a minor victim who was at least 12, but not 16, and

then two levels for the -- the guidelines say, "If, for the

purpose of producing sexually-explicit material or for the

purpose of transmitting such material live, the offense

involved the use of a computer or any interactive computer

service to persuade, induce, entice, or facilitate the travel

of a minor to engage in sexually-explicit conduct, or to

otherwise illicit participation, or to solicit participation

with a minor in sexually-explicit conduct, increase by two

1    levels."  So, we get a two-level increase because of the text

2    messages that Mr. Zeller sent to the purported 15-year-old.

3          So, that gets us to a 36.

4          Then for the Chapter Four enhancement, an additional

5    five levels are applied because of Mr. Zeller's history, that

6    he's a repeat and dangerous sex offender against minors.  And

7    that is all set out in paragraph 27 in the report.  So, that

8    gets us to the total offense level of 41.

9          Turning to Mr. Zeller's history and characteristics,

10   he's 46 years old.  Sadly, he had no father figure during his

11   upbringing.  His biological father died when he was very

12   young, and according to the presentence report he never called

13   anyone *Dad*.

14         His mother, even sadder, was addicted to crack

15   cocaine which he observed on at least one occasion.

16   Fortunately, according to the presentence report, she has been

17   sober now for 15 years.  He also remembers seeing his mother

18   physically abused.  At one point during his childhood he was

19   placed in foster care for a few months because of his mother

20   being arrested.  He reports a good relationship with her at

21   this time.

22         He has three full siblings and one maternal half

23   sibling that he has little to no contact.  I believe his

24   brother is here today.  His brother and sister were present

25   during parts of the trial.

     1          Now, Mr. Zeller was raised primarily by his mother

     2     and grandparents living between Ocala, Florida and the

     3     Sorento, Illinois area.  He has one child from a previous

     4     relationship, an 8-year-old son.  According to the presentence

     5     report he was 8 at that time.  He lives with his mother in St.

     6     Louis.  The child struggles with asthma.  He was living with

     7     Mr. Zeller full-time until the time Mr. Zeller was arrested on

     8     this offense, and Mr. Zeller has not seen the child since

     9     then, according to the PSR.  His mother, in the PSR, describes

    10     Zeller as an attentive father.

    11          Now, he married a different woman in November of

    12     2018, but reported he has been unable to locate her since his

    13     arrest in this case.  At the time of his arrest on this

    14     offense he was living with his wife and son in St. Louis.

    15     There are past substance abuse issues and mental health

    16     issues, as well.

    17          Now, the presentence report notes that Mr. Zeller

    18     earned a GED from a youth detention center in Florida, which

    19     closed in 2019, after a news article exposed decades-long

    20     child abuse and coverups.  He has expressed an interest in

    21     continuing his education and obtaining a college degree in

    22     business, according to the presentence report.

    23          Now, he has criminal convictions for Burglary; Grand

    24     Theft; Larceny; Resisting or Obstructing an Officer, two of

    25     those; Trespassing, and Battery.  Those are all set forth in

1    the presentence report, but none of them received points under

2    the guideline range.

3          Now, I note he has never served more than a year in

4    jail before his arrest in this case.  He has been in custody

5    on this charge since June 26 of 2020.  That's over three

6    years.  He also has three pending charges in Missouri and

7    several other arrests.  I believe there are warrants on the

8    pending charges in Missouri.

9          So, Ms. Burns, at this time you can make any argument

10   you wish to make about what is an appropriate sentence.

11         MS. BURNS:  Thank you, Your Honor.

12         Your Honor, the Government's recommending 405 months,

13   which is a guideline sentence.  It's at the high end of the

14   guidelines, and I want to highlight several of the things.  I

15   know I submitted a sentencing memorandum that I think support

16   a high-end guideline sentence in this case.

17         I think the first thing I want to note in just

18   looking at the guidelines and what they do take into account,

19   specifically the pattern of behavior engaged in this pattern

20   of activity with sexual offenses.  For that to apply, it

21   requires the instant offense and one other pattern of sexual

22   activity.  In Mr. Zeller's case there are a total of four

23   instances, separate instances -- the instant offense, plus

24   three others -- that have been submitted to the Court.  So, I

25   think in looking at that, while that same plus-five will apply

1    no matter what, individuals like Mr. Zeller who have just

2    committed one additional sexual activity would get that same

3    enhancement versus Mr. Zeller who has three examples of that.

4    I think that's important to consider in looking at the

5    guidelines and the fact that a high-end guideline may be

6    appropriate because of that additional pattern of behavior.

7            I think that in looking at -- You know, I don't -- I

8    don't, you know, discount that 405 months is a big sentence.

9    That is a lot of time, it's right under 34 years.  And I don't

10   take that lightly in making that request, but I think Mr.

11   Zeller is absolutely deserving of a sentence of that nature.

12           I think in looking at Count 1 specifically, where the

13   statutory maximum is life, it shows that Congress did

14   anticipate that individuals who commit these crimes, while not

15   all, but some are deserving of significant or even life

16   sentences.  And I think when we look at these facts, that's

17   Mr. Zeller.  I think when we look at these FBI operations that

18   occur, Mr. Zeller is the poster child of who they are looking

19   to find and did find in this case.  So, I think that's

20   important to consider in, you know, determining what the

21   appropriate sentence is in his case.

22           From my review of the 3553(a) factors, I don't

23   observe any mitigation as to, you know, explaining his

24   behavior in this case.  I think on some level there's an

25   aspect of aggravation in that Mr. Zeller was charged with

1    sexually abusing two barely teenage girls completely separate

2    from each other when he was in his early 20s, and he was found

3    not guilty of one and he pled to amended charges of the other

4    and effectively served a year in jail and then was released,

5    and that experience had no deterrent effect on him.  It is

6    clear that in his 40s, he's engaging in the exact same

7    behavior.  And it's not just a one-time thing that happened in

8    his mid 40s, again 20 years later, because within his phone

9    it's clear that there's at least one other incident where he's

10   talking to a 16-year-old, doing the exact same thing that he

11   did in this case.  I think that that behavior shows that there

12   is such a need to deter him specifically and that, frankly, I

13   don't know what will, and I think a significant sentence will

14   serve to meet that goal.

15           I think -- You know, I won't recount all the facts of

16   this case.  I know the Court sat through all the evidence.

17   But, the one thing that I do want to highlight that the Court

18   received information about through motions and through

19   submissions in the sentencing memorandum are these other

20   victims.  I think that -- You know, I know the Court has read

21   the additional chat that was submitted, the text messages that

22   Mr. Zeller engaged in with a purported 16-year-old, who FBI

23   had reason to believe is a real 16-year-old based on the

24   information that she provided.  She has not at this point been

25   identified, but she sent photos, she identified herself as in

1    Missouri, and I think that's important to consider.

2           And I also want to highlight the fact that his two

3    prior victims from Florida who are now, you know, in their

4    30s, both flew in for his trial to be present in case they

5    were needed to testify.  And while the Government did not

6    ultimately call them to testify based on the evidence and the

7    trajectory of the trial, I think it's important to consider

8    that that is a part of the Defendant's history and

9    characteristics and the facts of this case, because those two

10   victims who had to deal with court proceedings back when they

11   were, you know, 13 years old, are now again being brought back

12   into this and having to relive this experience.

13          I know the Court received a letter from one of the

14   victims, and the other victim, you know, candidly, I think was

15   very ready to just not ever think about Mr. Zeller again, so

16   she chose not to submit a letter.  But, Ms. Oelcher did submit

17   a letter to the Court.  And what strikes me about this letter,

18   I think, just highlights the seriousness of this type of

19   offense, the effects, the long-lasting effects this has on a

20   child that Mr. Zeller continues to prey on or similar-type-age

21   children that he preys on.  While at the time the victim may

22   have described her sexual encounter with Mr. Zeller as

23   consensual but for her age, I think her letter displays that

24   as an adult, her reflection now, having children and being of

25   an adult age thinking back on the impacts that has had on her

1  relationships, the way she looks at herself and just general

2  trauma, I think, is important.  And I think that shows just

3  the serious impact that these type of cases have on

4  individuals.

5        I also think the evidence was clear that but for Mr.

6  Zeller meeting FBI when he knocked on that door, he absolutely

7  intended to have sex with a 15-year-old and would have had sex

8  with a 15-year-old had that been who he actually met.

9        I think in reading his chats -- and the Court heard

10  all of those chats read and all of Mr. Zeller's words read and

11  his behavior in the interview and his behavior, frankly, in

12  court -- there is a level of manipulation that he engages in.

13  And when things aren't going his way he is obstinate, and I

14  think that manipulation was very clear in his messages which

15  he thought was a minor.  And it demonstrated that it appeared

16  he might be targeting these young girls because he was able to

17  exert control over them, he was able to show that he had

18  knowledge and he could, you know, kind of teach them

19  something, and I think that's incredibly concerning.

20        I think that a significant sentence is necessary to

21  reflect how serious this case is.  I think that Mr. Zeller has

22  zero respect for the law.  His criminal history, while he

23  doesn't receive points for it, shows that there is some

24  pattern of engagement with the criminal justice system where

25  he hasn't been deterred in general, but I also think in

1    specific to this type of crime he just absolutely doesn't

2    respect the law and how it applies to him.

3            I also want to highlight to the Court what was cited

4    in my sentencing memorandum about the U.S. Sentencing

5    Commission studies specific to sex offenders and sex offenses.

6    And while often we hear arguments in, you know, violent cases

7    or gun cases that as an offender ages their recidivism goes

8    down or offenses go down, but in sex offense cases that's

9    quite the opposite.  So, while I understand the sentence the

10   Government is asking for will put Mr. Zeller at an older age

11   when he is released or eligible to be released, I would note

12   even in his 70s, statistically they show that that risk

13   actually increases in sex offenders specifically.  And, so, I

14   think that that's something the Court should consider in

15   protecting the public, that that significant sentence will

16   serve to do that.

17           You know, finally, Your Honor, I just think it's

18   incredibly important to note in this case that at the end of

19   the day I think there is nothing that is going to stop Mr.

20   Zeller.  I think that he believes that he's above this, I

21   think he believes that he's smarter than everyone else and

22   that he will be able to outsmart and continue to do whatever

23   he chooses to do, and I think in looking at a necessary

24   sentence the need to be rehabilitated is important.  And I

25   think the first step in rehabilitation, specifically in these

1    types of cases, is being able to acknowledge the problem, and

2    I don't think Mr. Zeller has done that.  I don't think he's

3    capable of doing that at this point.  And, so, I think while

4    he will have many services provided to him at the Bureau of

5    Prisons that he could take advantage of, I'm not sure that his

6    interest in rehabilitation into this type of behavior exists

7    at this point and I think that just again further highlights

8    the need to protect the public, the need to deter him, and the

9    need for a significant sentence to highlight how serious this

10    offense is for him.  Thank you.

11        THE COURT:  And, what would be your recommendation

12    for supervised release?

13        MS. BURNS:  Your Honor, I would ask for, you know,

14    more than five years of supervised release.  I think it's

15    necessary, again, with the behavior he's engaged in, even if

16    he -- or even when he is registering as a sex offender that is

17    not the same type of oversight he would receive versus

18    supervised release where they will monitor his devices and

19    have a closer look at what he is doing.  And it is clear based

20    on his behavior that specifically monitoring of the devices is

21    something probably very important that would serve as a

22    deterrent effect to him to continue to engage in this

23    behavior.  So, I would ask for a term of supervised release

24    that is, you know, ten years or longer.

25        THE COURT:  All right.  Thank you, Ms. Burns.

         1          MS. BURNS:  Thank you.

         2          THE COURT:  All right.  Mr. Zeller, first, this is

         3   your chance -- If you had counsel, I would ask counsel to make

         4   an argument.  So, this is your chance to make any argument

         5   that you wish to make, and then I will give you further, if

         6   there's anything you want to say as part of your allocution,

         7   that you can state.

         8          DEFT. ZELLER:  Yes, ma'am.  I have some things to

         9   shuffle through.  Can these be moved and me like cuffed to the

        10   floor or something so I can freely go through each paperwork?

        11          THE COURT:  Grant, what's your position?  Or Jason?

        12          U.S. MARSHAL:  Your Honor, I think he would be

        13   capable of shuffling his paperwork while he's --

        14          DEFT. ZELLER:  I can't, Your Honor.  I have multiple

        15   documents to go through.  There's this thing down here I could

        16   be chained through with my shackles to where I can actually --

        17          THE COURT:  Well, the Marshals Service doesn't tell

        18   me how to decide cases, so I don't tell them how to do their

        19   job.  So, I will be patient, and just tell me what it is that

        20   you are looking for, if it's something that was filed earlier.

        21          And that reminds me, too, I wanted to correct

        22   something that I had said earlier.  When you asked at the

        23   beginning of the sentencing about the subpoenas, --

        24          DEFT. ZELLER:  Yes, ma'am.

        25          THE COURT:  -- they were received, but I did not have

1    them filed as part of the record; instead, I have noted in an

2    order that the Court received the proposed subpoenas on

3    September 7th.  That was one to Assistant United States

4    Attorney Stephen Weinhoeft seeking disciplinary reports of

5    another AUSA.  Mr. Weinhoeft was at one point the Acting

6    United States Attorney; he is not currently.

7         And he also wanted to subpoena Agent Dan Cook,

8    seeking the duty roster for Operation Beach Apple, which was

9    the operation that led to Mr. Zeller's arrest.  And I said at

10   that time the Court declines to issue these subpoenas as the

11   fact-finding process is over and the jury found Mr. Zeller

12   guilty on March 29th of 2023.

13        So, Mr. Zeller, you don't need to present anything

14   that's already in the record, anything that goes to your claim

15   of innocence or challenging the fact-finding process.  We are

16   at sentencing.  The only issue before me today is what is an

17   appropriate sentence under all of the factors that I read

18   earlier; that being what is sufficient but not greater than

19   necessary to achieve all the statutory goals of sentencing.

20        So, if there's something there that goes to what you

21   think is an appropriate sentence, then I am all ears.  But, we

22   are not going to rehash the trial, rehash all of my rulings on

23   other things.

24        DEFT. ZELLER:  I understand.

25        THE COURT:  Okay.  So, go ahead.

1          DEFT. ZELLER:  Yes, ma'am.  I would like to start out

2    with this chat that was found in my phone.  This is a chatbot.

3    I mean, the prosecutor sits here and talks about how I am

4    grooming someone and trying to control them.  Clearly in this

5    I told them it was a scam, to leave me alone.  That's what I

6    thought it was.  I thought it was a scam, Your Honor.

7          THE COURT:  And what do you mean exactly when you say

8    it was a chatbot?

9          DEFT. ZELLER:  A chatbot is like a fake person,

10   someone trying to scam you for money, is what that is.

11         THE COURT:  Okay.  And, what specifically about it

12   says that you think that this person was trying to scam you

13   for money?

14         DEFT. ZELLER:  Well, I'm like, "Tell me about

15   yourself," you know, like, "tell me about yourself."  They

16   immediately -- They say a little bit about theirself,

17   immediately send a naked picture that I didn't even ask for.

18   I'm like, "Wow."  They immediately started sending more naked

19   pictures, you know.  Then she asked me for a picture of my

20   privates; I declined.  She immediately after that asks me, "Do

21   you work?"  That's a red flag for me right there.  This has

22   happened to me several times online, like on dating

23   applications, seeing stuff like this.

24         THE COURT:  Where specifically are you referring to?

25   So, I was with you -- Well, give me the timestamp on where she

1    asks, "Do you work?"

2          DEFT. ZELLER:  Do I work.  Hold on.  I know it's in

3    here.  She says, "Do you work?  You will have to be able to

4    take care of me."  She asked if I have any pictures.

5          THE COURT:  I see at 11:54:38.  This is all on July

6    31st, 2019.  You ask, "I will" -- Is that -- Okay.  That's

7    where she says, "Do you work?  Are you single?  Any kids?"

8          DEFT. ZELLER:  Yes, ma'am.

9          THE COURT:  Okay.  Gotcha.

10         DEFT. ZELLER:  A little bit after that I am like,

11   "I'm waiting for you to say you are underage and report me if

12   I do not send you money."

13         I mean, obviously --

14         THE COURT:  Okay.  Tell me the timestamp on that so I

15   can follow along.

16         DEFT. ZELLER:  12 -- 8/1/2019.  12:12:45, it's on the

17   next page at the top, page five.

18         THE COURT:  Okay.

19         DEFT. ZELLER:  And then the conversation goes on

20   more.  And, as you see, when I tell her that I think she's

21   fake, I -- they ask me my name.  I gave the name as Shawn,

22   which that is the name that I normally say when I think

23   someone is fake.  This is the same name that I gave the FBI

24   the night that I was talking to them when they asked my name,

25   that I thought they was fake.  That obviously was never

 1   brought in at trial.

 2          THE COURT:  Okay.

 3          DEFT. ZELLER:  And then the next day, to test her --

 4   or hours later, I guess it was -- I act like I sent her a text

 5   on accident.  "I will give you $500 to hook up."  She

 6   immediately, "Oh, yes, we can do that.  How much money will

 7   you send me?"  And I'm like, "Yeah, wrong person.  Sorry, you

 8   are fake, deleting your number."

 9          This is a prime example of what I was talking about

10   when I was being -- in my post arrest statement when I was

11   speaking to the FBI, when I was like, "Hey, I thought I was

12   being cat-fished."  You know, this stuff happens all the time.

13   It's a shame that my lawyer didn't bring this to my attention

14   beforehand, because this corroborates what I was saying all

15   along, you know.  But I did not see none of this until the day

16   I came in trial and it was in the things to be used against

17   me.

18          THE COURT:  Okay.  But, you don't deny that this was

19   you; that whoever was on the other end, that you were

20   chatting, correct?

21          DEFT. ZELLER:  Oh, yes, it was me chatting, but I'm

22   saying if it was a real person the Government would have found

23   -- They flew two people from Florida here.  You don't think

24   they could find out if this was a real person, have them

25   testify against me?  Obviously it was a fake person.  Now they

 1   are trying to use it against me.  It shouldn't be too hard to

 2   find a 16-year-old girl.  She should be in school, there

 3   should be school records or something.  If they can go through

 4   my phone and find all these messages, how can they not find a

 5   16-year-old that's really a 16-year-old girl?  You're going to

 6   tell me -- That just don't make sense to me.

 7            THE COURT:  Now, you did send her a picture at one

 8   point, correct, of yourself?

 9            DEFT. ZELLER:  Pardon me?

10            THE COURT:  Did you send her a picture of yourself?

11            DEFT. ZELLER:  Yes, ma'am, I did.

12            THE COURT:  And in the first -- Right away you say,

13   "Hello."  She said, "Tell me about yourself," and then she

14   says in the next, that starts at 11:04:25, that she will be 17

15   in August.

16            DEFT. ZELLER:  Right.  17-year-olds to start classes

17   for forensics?  How many 16-year-olds -- I mean, that's just

18   not believable.  How many 16-year-olds do you know personally

19   who's starting college classes for forensics?  I don't know

20   none.  That's just something unbelievable.  That right there

21   when I seen that, I was like, "Yeah, okay, this is

22   impossible."

23            THE COURT:  But after that point you sent her a

24   picture?

25            DEFT. ZELLER:  I'm just online looking for someone to

1    talk to for something to do, Your Honor.

2            THE COURT:  Okay.  Other than this chat with the

3    16-year-old, which is attached to the Government's sentencing

4    memo, what are your other points?

5            DEFT. ZELLER:  My other point is this letter from --

6    Well, first of all, before we get to that... Priors.  We are

7    talking about priors.  What priors?  I don't have a prior

8    sexual conviction.  Two was -- Two of the things I was

9    arrested for, a jury of my peers -- peers found me innocent

10   for.  Another thing, after I sat in jail for not a year, but

11   707 days for that, they came to me, because I was on

12   probation, as you can see, for a burglary, grand theft,

13   something like that -- I don't exactly remember what it was,

14   it's been so long ago.  But, they came to me and the Judge --

15   After I beat the first trial, Judge Eddy looked at the State's

16   Attorney and said, "You better have some better evidence for

17   the next one, because this made no sense to take him to trial

18   for this."

19           So, when I go back in front of him the next time,

20   they come to me and say, "Hey, we will give you time served

21   right now if you take a simple battery on your probation,"

22   that I was on for like five years that I kept trying to get

23   off of, so I jumped on that just to get off of probation.  I

24   don't have no prior -- no conviction of no sex charge, Your

25   Honor.

1          THE COURT:  Okay.

2          DEFT. ZELLER:  None.  And, also, this letter from

3  this Defendant, I object to this letter being sent.  It was

4  untimely received yesterday, one day prior to sentencing.  The

5  discovery period is closed.  Prosecution attempts to

6  relitigate a case where I was found not guilty in and

7  subjecting me to double jeopardy, which violates my

8  constitutional rights in 41 U.S.C. 200h-1, Civil Rights Act of

9  1964 --

10          THE COURT:  Yeah, slow down a little bit.

11          DEFT. ZELLER:  I'm sorry.  42 U.S.C. 2000h-1, Civil

12  Rights Act of 1964.

13          Prosecutor Burns intentionally faked this -- I mean,

14  not faked, but faxed this information to the jail, and I

15  received it from a correctional officer unopened, violating

16  legal mail delivery procedures, which is a First Amendment

17  violation of the United States Constitution.  That would be

18  *Hayes v. Idaho Correction Center*, 849 F.3d 1204, 1211 (Ninth

19  Circuit 2017).  And, also, she just had this man right here

20  bring it back to me.  And I understand he's just doing his

21  job.  He just brought it back to me there again.  This is like

22  legal mail.  This should be sent closed.  It's just being

23  handed -- When I received that from the Sergeant yesterday,

24  obviously he read it.  He was like, "Oh, I don't know if you

25  want to take that back to the block."

1          THE COURT:  Okay.  But, this is a letter from an

2     alleged victim.  It's not legal mail, it's not correspondence

3     from your attorney.  Do you understand that?

4          DEFT. ZELLER:  Okay.

5          THE COURT:  And it's not discovery, because, as I

6     said, the fact-finding process is certainly closed.  This was

7     something that the Government submitted as to the sentencing

8     issue, which, of course, as I said, is the only thing before

9     the Court today.

10         DEFT. ZELLER:  Right; okay, Your Honor.

11         THE COURT:  So, your next point?

12         DEFT. ZELLER:  My next point is this -- the same girl

13    we are talking about here, Katrina, was someone -- She

14    implicated me in a '98 Florida case that was tried and I was

15    found not guilty by a jury of my peers.  And since Ms. Burns

16    wishes to enter with information to further show this Court's

17    reliability to malice prosecution to attempt to persuade the

18    Court that my character is based on preying on young children,

19    Katrina writes in her September 8th letter that in 25 years,

20    since 1988, she has had relationship problems, counseling that

21    was ongoing, and self-esteem and body shaming, to name a few

22    of the things she said in this letter.  But, let's revisit her

23    original statement to the Florida Assistant State's Attorney

24    William Jarvis on June 16, 1999 when Katrina was 13 years old,

25    not 12, like her letter claims she was.

1          Do you have that, Your Honor?  Do I need to wait for

2    you to find that?

3          THE COURT:  Go ahead.  If you are reading, don't read

4    too fast for the Court Reporter.

5          DEFT. ZELLER:  Page nine of that, it's actually

6    Document #182, is where it is.  It was filestamped 7/5/23.

7    But there's discrepancies all throughout this that she did

8    herself.

9          Page nine, line 2 through 25, where she gave

10   contradicting statements.  And it's kind of hard to sit here

11   and go through each one of these, for me to sit here and read

12   it to you myself, --

13         THE COURT:  Okay.

14         DEFT. ZELLER:  -- because I'm handcuffed.

15         THE COURT:  Okay.  You are challenging what she said

16   to the State's Attorney?

17         DEFT. ZELLER:  No, she drew an X on the floor -- I

18   mean, I have a whole list of it I would like to read out to

19   you.  But she drew an X -- First she said I was sitting right

20   there talking to her, then she drew an X on the floor when

21   they asked to place me in the room.  I was clear across the

22   room.  She said I had sex with her friend, then she said no

23   she didn't mean to say that.  She contradicted herself all

24   through the whole thing, Your Honor; through the whole thing.

25         Page ten, 7 through 25, again where she goes on to

1    the state that events were sketchy; page 11, lines 1 through

2    14 where she alleges that events took place that were untrue;

3    page 21, 19-25, Katrina said she learned Defendants's name in

4    the truck on the way there.

5           And then after that she will go on to say she learned

6    my name on the same night.  Goes on to say, "I didn't find out

7    what his name was until a couple weeks later."

8           Page 22, lines 5 through 9, she then circles back to

9    she didn't know his name the first night again.

10          She contradicts everything she says all throughout

11   this.  This is why I was found innocent of this by a jury of

12   my peers.

13          THE COURT:  Okay.  That is noted and it is part of

14   the record.  The Government filed that.  It's a 111-page

15   deposition transcript.

16          DEFT. ZELLER:  I have one more thing, if you don't

17   mind, Your Honor, I would like to say about that.

18          THE COURT:  Okay.

19          DEFT. ZELLER:  Her friend that she said to go ask

20   about this -- Her friend said she's a chronic liar and always

21   says she's pregnant.  Her own friend said this.  I don't know

22   this girl.

23          THE COURT:  Okay; all right.  What's your next point?

24          DEFT. ZELLER:  The prosecutor says I went and knocked

25   on the door that night.  No, I didn't.  I was out in the

1    street.  She was there, she should know that.  I was out in

2    the street, I drove away.

3              THE COURT:  Okay.

4              DEFT. ZELLER:  I will explain more of that in my

5    allocution letter, because I don't go into great detail about

6    that.

7              THE COURT:  So, you are disputing the fact that you

8    didn't get to the door to knock on the door; they met you

9    outside, correct?

10             DEFT. ZELLER:  It says in my interrogation that I was

11   arrested in the street.

12             THE COURT:  Okay.  All right.  I did hear that

13   recording at trial.

14             Okay.  And, your next point?

15             DEFT. ZELLER:  Oh, one more thing about the Katrina

16   thing.  She said she was in counseling.  Like not only does

17   she contradict herself in there, this letter contradicts

18   everything she says.  She said she was in counseling due to

19   what happened with me.  In the transcript the State

20   Attorney -- She said she was in counseling months prior to

21   this even happening having to do with theft, she stole from

22   her counselor.  So, she's still lying about things, Your

23   Honor.

24             Also, she didn't even get my name right.  She put my

25   name as Francis Vallie Zeller.  This don't make sense to me.

1    I don't get that.  I mean, her story has changed so much over

2    24 years.

3            And, once again, I was found not guilty of this for

4    reasons like this, all the contradicting statements she made

5    at trial.

6            THE COURT:  Okay.  And, I note that.  The presentence

7    report reflects that.

8            DEFT. ZELLER:  And now it's being used against me 25

9    years later, something I was found not guilty of.  That's what

10    I really don't understand.

11            THE COURT:  Okay.  Well, do you understand that the

12    burden of proof and this is -- Since you are acting as your

13    own lawyer, the burden of proof at sentencing is different

14    than the burden of proof at trial.  The burden of proof at

15    trial, as you know from the trial in this case, is beyond a

16    reasonable doubt.  That's a much higher standard than a

17    preponderance, which means it's more likely true than not

18    true.  So, the Court is allowed to consider evidence.

19    Sentencing is very different from trial.  The burden of proof

20    is lower, I can consider hearsay.  So, you know, that is what

21    it is.  You were tried, you were found not guilty, I

22    understand that.  You were tried in this case and found guilty

23    beyond a reasonable doubt.

24            So, let's move on from this -- either the 16-year-old

25    chat that was found on your phone or the victim in Florida.

1          What's your next point?

2          DEFT. ZELLER:  I believe that's it, Your Honor.  I

3   don't want to sit here and waste your time.  I believe that's

4   it, honestly.

5          THE COURT:  Okay.  Ms. Burns, before we move on to

6   allocution, is there anything you would like to dispute on

7   that or anything you want to add?

8          MS. BURNS:  I do not have anything to add.

9          THE COURT:  Okay; all right.  So, now, Mr. Zeller,

10  you have a right -- Every Defendant has a right to make a

11  statement in mitigation of sentence.  As I said, that's

12  different than making your argument, which I get, but -- and

13  which I just heard from you, but you have an absolute right to

14  make a statement and present any information to mitigate your

15  sentence.  So, now, speaking on your own behalf, just like you

16  would, because it's your right, what would you like to say

17  before sentence is imposed?

18         DEFT. ZELLER:  My allocution?  That's what you are

19  asking, correct?

20         THE COURT:  Yes.  And, again, if you are reading,

21  don't go too fast for the Court Reporter.

22         DEFT. ZELLER:  Yes, ma'am.  I pledge allegiance to

23  the flag of the United States of America and to the republic

24  for which it stands, one nation under God, indivisible, with

25  liberty and justice for all.

1          I always proudly proclaimed our Pledge of Allegiance.

2     I recited this from my early childhood on and I believed it

3     was true, even when it came to me in this case.  I never

4     imagined that my own United States Government could create a

5     crime and trap me with pretentious or a perpetrated person,

6     while also fabricating evidence to convict me and possibly

7     send me to prison for a significant portion of my life.  The

8     purpose of an instrument means that the substance of it, or it

9     appears on the face of the instrument, and is distinguished

10     from the tenor, which means an exact copy.

11          So, yes, I am having difficulty for accepting

12     responsibility for an intentionally concocted crime by the

13     Government.

14          In *United States of America v. Anderson*, Seventh

15     Circuit 2022, a case similar to mine, is a prime example of

16     our police state's overreach.  While predation of children is

17     a serious offense, it begs the question as to why the FBI

18     logged onto an adult dating application.  Child predators

19     actually seeking children are on places where children are

20     likely to be present, not on an adult dating application.

21          The Government's special reason for Operation Beach

22     Apple was to apprehend child predators supposedly.  This case

23     is but one of the innumerable cases where the Government

24     creates a crime where none existed without the Government's

25     influence.

1          I am not lashing out or attacking anyone, as my

2    previous counsel has said.  I am simply making my voice heard

3    in this matter.  My only way of protecting myself in this is

4    to make sure the Court hears my claims.  I am making sure it's

5    all on the record so that they won't be called moot points

6    later for my appeal.

7          I have had to submit papers and motions without my

8    Counsel's help to act as my own attorney in the shadows of a

9    biased Court.  Because of this Counsel's failures, I'm left

10   with no choice but to prepare and fight and appeal.  I am

11   confident had Defense Counsel actually prepared me for trial,

12   we would not be having a different -- we would be hearing a

13   different outcome today.  It's a shame on my Counsel that they

14   refused to -- refused me a fair trial because of their views,

15   bias, and subsequent abandonment by not doing their

16   investigations.

17         I have spent 39 months away from my son, missed out

18   on his birthday, sports events, and not been there for my

19   mother's failing health, which has placed undue stress on her

20   in her weakened state.  She has had two major surgeries and is

21   dealing with heart troubles.

22         I did not believe this perpetrated minor was real.

23   Contact originated on MeetMe, an adult dating application.  I

24   was asked for my phone number and was contacted first;

25   however, that has been changed.  The account name -- Their

1   account name on MeetMe was *Looking For Fun.*  Also, that has

2   been changed.  I was sent multiple pictures of a different-

3   looking woman the first night.  I was suspicious that this was

4   a scam, because the following day I was sent a text verse and

5   more pictures of a different-looking woman.  These pictures

6   were not filter pictures.  You could plainly tell the women

7   was different body sizes, like size 7, size 8, and in one she

8   was really skinny, so it was definitely was not a filter

9   picture.  Several times I pointed out the pictures were of

10  different women; however, evidence only shows one time of me

11  questioning the different pictures, to where I was told

12  because of makeup, which was an obvious lie.  In the evidence

13  I was sent pictures of a woman with underwear in her mouth.  I

14  assume that this was possibly a woman searching for a sugar-

15  daddy-type.  All the highly sexual talk that was done on the

16  FBI's end is now missing.

17          On June 26, 2020, I was again sent a picture first

18  the following morning of another woman.  I was asked if I was

19  coming, to which I stated, "No, I don't believe you are real."

20  This is also not in discovery.  The person on the other end

21  still claimed to be real.  I still said, "I don't believe

22  you."  I suggested an app called Kik that I was familiar with

23  when a photo is stored, is shared on Kik, it shows one of

24  either two ways.  It will either say, "gallery" underneath the

25  pic or it will say "camera" underneath the pic; gallery being

1  a picture-stored gallery which was just taken from the at

2  wait.  Gallery being a stored photo, the camera is a live

3  photo just taken using the app.  I was sent a message from a

4  Kik user named Alexa B.  The first picture sent showed

5  "gallery" as underneath the picture, to which I said, "No, a

6  new picture using the camera, not a standard gallery picture."

7  They responded with a pic using the flash that hid the face of

8  the woman.  I asked for another that showed the picture, which

9  the next picture was very dark and hard to see.  I told them I

10  couldn't see their face, it was too dark, and asked for a

11  better picture.  They sent a video of a woman shaking her

12  skirt, showing off white boy-short underwear.  They then asked

13  if I was now coming to meet up, to which I replied, "Yes, now

14  that I believe you are a real person and I see you are an

15  adult."  At that time they did not say, "No, I'm not an

16  adult," yet all these messages are missing.

17           I asked for pictures of -- I asked for an ass pic,

18  which is photo number 14 in Document 187, which was a camera

19  picture the night of 6/26/2020; however, the person's face

20  can't be seen.  At the time I did not realize the adult woman

21  was who I suspect as Prosecutor Burns and she was the one

22  sending the photos.  I would not realize this until months

23  later, considering all the fake pictures, and I was still very

24  skeptical about meeting them.  That's why I asked if they were

25  trying to blackmail me.

1          That is still in the evidence.

2          I felt this was some sort of extortion scam.  Perfect

3   evidence of this type of scam, which is Document 181-3, which

4   is what the prosecutor wishes to use as an enhancement to

5   sentence against me.  This is one of the scams I spoke about

6   in my post-arrest statement.  It is a shame my Counselor never

7   shared this with me to support the facts.  I never seen this

8   until the first day of my trial.

9          There is no child porn or no messaging of underage

10  girls on my phone.  In fact, at trial, Document 151,

11  Government #17, you can see the name on this conversation that

12  she is using to enhance me is Kristina G.  However, if you

13  look in it, the name is Keri.  I used the false name of Shawn

14  like I always do when I believe a person on the other end

15  could be false or dishonest, just like I did with the FBI/OCE.

16  I was looking for a way out, because I felt this was another

17  scam.  The age was stated once when I showed disbelief about

18  multiple pictures.  The age was not insisted upon as it is,

19  nor when I said I would show up, since I could clearly see the

20  woman was an adult.  I wasn't sure what to do.  Report to the

21  cops?  What if the address is fake?  I thought, "Drive there,

22  have the person come outside, and then drive away."  And a

23  completely different person opened the door as I drove by.  I

24  seen shadows of other people inside.  I thought, "Yep, a

25  scam," and I started to drive on.  Unmarked cars converged on

my car.  My first thought was that I was being robbed and
killed and never see my son again.  I was pulled out of my
car.  Never have I been so grateful to see the police.  A
dark-haired woman in an FBI jacket handcuffed me very tightly.
Later on I found out this woman was Prosecutor Burns.  FBI SA
Jacob Frechette took me from her.  I explained to him that I
believed this to be a scam or robbery until I seen the police
and that I had a son at home.  I immediately requested an
attorney.  He told me I did not need a lawyer as long as I
didn't have any child porn, sex ring things on my phone, that
I could go home, because actually I did nothing wrong,
because, "You're right, no underage person is here.  Just sign
the waivers, let us check," and I could go home to be home
with my son and he took me inside the house.

Throughout the questioning, what Frechette told me
about going home was the opposite opinion of the three people
questioning me.  I asked multiple times, "Can I go home?"
That can be heard in my interrogation.  I was unaware of what
the real method of questioning was, being asked the same
question several times in different ways to get the response
desired.

At first I denied being under the influence of drugs
and alcohol, thinking I would be allowed to drive home.  I was
under the influence of cocaine and had been drinking most of
that day.  I realized me going home was not true, but still

1    had the hopes that I would be released after the interviewer

2    said the man who brought me inside was the one who had to say

3    if I had to go home.  I said 12 to 14 times about a catfish

4    fake person or being scammed; however, the majority of things

5    I said is missing except when the tactics of questioning got

6    the responses the questioning were trying to get -- the

7    *questioners* were trying to get, excuse me.

8              The interviews was recorded on an old-fashioned

9    cassette tape-recorder and was not videotaped.

10             I was informed that a prosecutor was on-site and she

11   decided if I got -- and if we got bond.  During my bond

12   hearing, while SA Frechette was escorting me he was bragging

13   to his partner how they forced the courts to reopen.  During

14   the bond hearing I told Ethan Skaggs, my Public Defender, I

15   wanted a preliminary hearing.  He told me I had a better

16   chance of getting bond if I waived it.

17             In August, a few days before my arraignment, another

18   detainee came back from court and told me to pay attention to

19   the blonde and picture her with dark hair.  It was then in

20   court that I realized it was Prosecutor Burns who handcuffed

21   me.  The other person who told me, stated this, she also

22   cuffed him that night.  I will share this name later on during

23   the appeal, as his name means nothing to this Court right now.

24             Approximately one week later, I received discovery

25   and immediately noticed my MeetMe account name was different

1    and in questioning FBI twice, states account name is *GuyGuy* on

2    MeetMe, and then my discovery shows it is *Just Fun*.  And the

3    FBI Kik chat was different, along with photos I sent, except

4    Document 187, picture 14.  Then realized those camera pictures

5    are Prosecutor -- then realized those were camera pictures of

6    Prosecutor Alexandria Burns.  My interview was edited and

7    several was missing, and messages I sent were severely edited

8    to perceive me as a pedophile functioning alcoholic.  Later I

9    seen that this was all done to fit the elements of the

10    indictment.  I asked CJA Juengel to subpoena these things

11    pursuant to an evidentiary hearing.

12           In my civil suit, 3:22-cv-01163-JPG, Exhibit J, is

13    the letter Juengel sent for the authorization, but never

14    followed through.  I requested him to inspect evidence, take

15    photos of Kik timestamp, view Kik chats, explained to him that

16    Kik timestamps requires you to tap a message to show the time

17    and date, so you have to physically hold the phone to do so.

18    It took him weeks to do so.  Then on Thanksgiving vacation,

19    2020, he claimed it wouldn't -- the date and timestamp would

20    not come up when he tried to view the evidence, because the

21    phone had to remain on airplane mode.  To me, that really made

22    no sense.  So, during Thanksgiving vacation I called my

23    brother, I asked him to perform what I was asking on one of

24    his old phones, to pull it out, connect it to Kik, message a

25    random person, then I had him take his phone off airplane mode

1    -- I mean, put his phone on airplane mode, I'm sorry, and tap

2    a message to see if the time and date came up, and it did.

3    So, after that, when Juengel got back, I confronted Mr.

4    Juengel and he acted like he just didn't know what I was

5    talking about.  So, he went back and took better pictures, and

6    that's when I got the pictures that a lot of my exhibit's

7    based from.

8              After this I was furious.  He talked about getting an

9    expert.  He would not do none of my subpoenas, but he did

10   finally get an expert for me.  However, he would never show me

11   this expert report.  I asked him once we seen it, the things

12   from the messages and the pictures that didn't make sense, I

13   asked several times for an evidentiary hearing; he kept

14   refusing.  It got to the point where I wrote the ARDC.

15             Attorney Stobbs appeared on my case.  I told him

16   everything about the subpoenas I wanted to prove my case and

17   not being shown the expert's reports, asked him to -- I asked

18   him to return with discovery.  He returned at a later date

19   without discovery.  He refused to submit subpoenas and

20   informed me that he would only go by the Court's discovery or

21   by the Government's discovery and will only discuss what he

22   deemed appropriate during our meetings.  I had no choice but

23   to contact my Judge on August 27th -- I had no choice but to

24   contact my Judge again.

25             On August 27, on a Zoom onference, I explained my

1    issues.  He said -- Stobbs said he's used to people lying,

2    perhaps he would subpoena some things, and he was thanked for

3    that.  He did the bare minimum and was not helping me

4    effectively.  When asking for evidentiary hearing, he refused.

5    About this time I wrote the ARDC on him.

6            Stobbs did cellphone data, subpoenaed for days that

7    favored the Government for the texting on my phone.  I

8    explained things were retyped after my arrest.  Stobbs told me

9    he would subpoena Kik, but he didn't have the info needed.  I

10   provided this information to him.  It can be seen in Document

11   202, page 8.  He put in subpoena -- He put in the wrong

12   information.  When I confronted him about wrong information,

13   he refused to submit the subpoena once again.  I felt the need

14   to reach out to Judge Rosenstengel yet again.

15           On February 22nd, I came in front of you twice, Your

16   Honor.  Immediately Stobbs looked at you and told you I wrote

17   the ARDC on him and Burns.  He acted as if I never gave him

18   the info he needed for the subpoena, but, in truth, how could

19   he have guessed the account name and ran the user and the

20   account name together?  How could he have guessed a whole

21   e-mail address and left one letter out?

22           I brought up MeetMe subpoenas.  Stobbs cited the

23   prosecutor wanted me to sign a waiver, because the phones

24   would have to come off of airplane mode to get the

25   information, the e-mail for the MeetMe subpoena that I needed.

1   I declined, showing proof of pictures that I had from Juengel,

2   that the phones, in fact, did not need to come off airplane

3   mode to get the information.  One picture was a picture of the

4   Skout account.  The phone was on airplane mode.  It's in the

5   docket that day, it clearly came up.  The other picture was a

6   picture of me saying it's not connected to the internet.  So,

7   clearly all they did was tap the internet off on the phone for

8   that picture.

9        I was then deemed a problem client by you and Stobbs

10  for not being foolish enough to sign a waiver and list showing

11  exculpatory evidence.  Also, the info I needed for subpoena

12  would be present in my e-mail.

13       Again, I requested Stobbs to do an evidentiary

14  hearing.  He told me he refused to do it unless I signed that

15  waiver, which I would not do.  Stobbs later claims he went

16  over the entire discovery with me; however, it was only

17  partially and once.  I pointed out reasons, once again, why I

18  needed an evidentiary hearing.  This can be seen in

19  3:22-cv-01163-JPG, Exhibit KK.  Stobbs dropped expert Scott

20  Bokal out of my case for months, acted as if Kik was not

21  responding to the subpoena.  He kept asking me to sign off on

22  the subpoena, which I kept refusing to do.  On June 2020, I

23  called him out on it, showing him the subpoena was in his

24  e-mail since February of 2022.  This can be seen in Docket

25  number pages 4 and 5.

1          I don't know what docket number that is.  I didn't

2     place it here.

3          The Kik subpoena has timestamps, every message ever

4     sent by me on the app.  On the app there's a total of 450

5     messages.  There's no timestamps of the FBI/OCE chats on June

6     26th, 7 p.m. to 8:55 p.m.

7          FBI deactivated the Alexa B account and fabricated --

8     and then they fabricated Lexy Smith account and they

9     deactivated that.  That's why that account don't even show up

10    in the subpoena, because they had to change the time and dates

11    and it would have showed up.

12         The chats can be seen in -- Wait a minute.  The chats

13    can be seen in Document 187-13, pages 13, 14, 15.  Page 12

14    shows the FBI chats do not exist.  That is from the Kiks

15    subpoena.  What is even more troubling is page 11 shows a date

16    timestamp of June 19th, which is a message I sent to another

17    Kik user, when page ID -- page 10 of the certified Kik records

18    shows I did not send any messages on June 19th at all, period.

19         Also, page 16 shows another date timestamped of

20    6/26/2020 at 5:04 a.m.  Again, page 12 of Document 187 shows

21    no such timestamp in the Kik records.  It's impossible to

22    believe that the time and dates of Government chats in my

23    phone would show correct date and time, but all 450 chats are

24    incorrect with authentic records.  Obviously theirs would be

25    incorrect, too, if these 450 would be incorrect.  I pointed

this out to Stobbs, again asking for an evidentiary hearing,
and got no response from him.  After that he disappeared from
my case for seven months.  Eventually Mr. Campanella visited
me.  He stated he would investigate and be back in two weeks.
When he returned, he said Stobbs was lead attorney and he was
told not to investigate.  I pressed Campanella to do so.  He
stated the Government wouldn't allow him near the phones and
this isn't a perfect world, he couldn't help with the MeetMe
subpoena or evidentiary hearing, because Stobbs made all trial
decisions.  Every questions I asked him, he gave no answers.

          After pretrial both met with me -- After pretrial,
Stobbs met with me one time.

          Oh, wait.

          Before pretrial they met with me one time for
approximately 20 minutes.  I pressed Stobbs for evidence
hearings using Kiks subpoena.

          Trial started.  Very much to my surprise, Jordan was
the lead attorney.  During trial, Michael -- Agent Michael
Carter stated he was the one texting me and he also stated
that the picture photo 14 in Document 187 is a picture he sent
and it was a gallery photo.  That is absolutely impossible,
because that photo would say "gallery" underneath it.  I
pointed both of these things out to my counsel, because this
is something I knew that there's no way they would be able to
get around and my Counsel could investigate and prove this;

1    however, they didn't want to prove it.

2           When it finally happened at trial and I pointed it

3    out to Stobbs, he told me it was the least of my worries.

4           Document 39-3, page 8, as well, states a prosecutor

5    was on-site.  I begged Counsel to come see me to prepare me

6    for the stand for the first -- After the first day, they both

7    declined.

8           On the second day of trial the Judge asked me if I

9    was going to take the stand.  Due to no trial preparations by

10   Counsel, I didn't know what to do.  The Judge had us go in the

11   back for 20 minutes.  Stobbs stated he would not bring up the

12   Kiks subpoena or enter it into evidence.  I came back out

13   again and I told the Judge I still didn't know what to do, if

14   I wanted to take the stand or not.  Once again, the Judge sent

15   Counsel and me back to talk.  I asked Stobbs how would the

16   entrapment defense work; he refused to answer my questions.

17   Stobbs said I had to say I sent all these texts, not to bring

18   up evidence that's been fabricated, and he would ask me why I

19   filed a civil suit against Prosecutor Burns.  He told me I was

20   to say that I did so because I was scared and didn't know what

21   else to do.  I refused, stating he had privy to the Kik

22   subpoenas and the timestamps do not line up.  He said there's

23   no expert here to say that, to tell, the jury would not

24   believe me -- so the jury would not believe me over the FBI.

25   I argued the jury should be allowed to make that

1    determination.

2          Stobbs then said, "That's why you will be getting 30

3    years," your son will be an adult by the time you get out of

4    prison.  This is what happens -- This is what I get for

5    writing the ARDC on him and other lawyers that I got off his

6    case.  He knows I filed a 2255 on him and he keeps good notes

7    for cock-suckers like me.  And he has Jordan Campanella -- And

8    now he has Jordan Campanella here as a witness.  Once they

9    file my direct appeal they will be done with my case.

10          The reason I had them dismissed is after looking up

11   things I felt they was going to filed an *Anders* brief on me

12   and not even appeal it.

13          I thought the record ended at trial, told the Judge

14   about the Kiks subpoenas, because I thought record was about

15   to end.  Judge stated I had to take the stand for evidence to

16   be admitted, I told the Judge my Counsel was against me.

17   After trial I found out the record is not in until sentencing.

18   So, I have been scrambling, trying to get everything on record

19   later for my appeal.  Stobbs never came to see me post trial;

20   Jordan has.  Jordan pressed me not to appeal if there's a

21   chance they can get me the mandatory minimum at sentencing.

22   He seemed more interested in what my allocution would be if I

23   would put all these things on the record, if I would just stay

24   silent and let him get me the mandatory minimum.  He kept

25   telling me he -- When I didn't agree to this, he kept telling

me he knew nothing about the *Kimbrough* decision or downward departures, and obviously this is because I was filing motions exposing the things that they did not do at trial.  Had both Stobbs and Campanella -- I had Stobbs and Campanella both removed at 7/18/23 hearing.  When paper discovery, Campanella attempted to provide, Stobbs chastised him.  The Judge persuaded me to keep Campanella standby only for sentencing, then he stated he could not provide me paper discovery, also said I had to sign a letter when he brought me things in the first time for standby.  In the letter it was stating he had no missed calls from me, because he was upset.  I told the Judge that his office would not answer the phone calls.  And I looked at him and I said, "In fact, you are right.  You do have no missed calls from me, Mr. Campanella, but that would be because your office would not accept a collect call; therefore, there can't be no missed calls."

I was sent an order to reply to a PSI.  I was given like a week and a half to do it.  At that time I couldn't even call Mr. Campanella.  He told me he would be back in two weeks at sentencing.  I didn't have time to write him a letter or anything else to find out for standby, so at that time I just decided to go ahead and remove him because there was no sense in having him for nothing.

In the Motion to Compel, Operation Beach Apple, there was four names; myself, Sewell, Lotz and York.  Sewell and

Lotz names are familiar as two of the 14 people arrested in
the June 2020 Operation Beach Apple sting.  However, Jeffrey
J. York was not, so I have been following info on his -- on
York's case very closely.  I found out that York was arrested
in Marion, Illinois in March 2020.  Keep in mind, York also
says he's part of Operation Beach Apple.  It's not one, not
two, all they both say is it's Operation Beach Apple.  So, how
was he arrested on Operation Beach Apple three months prior to
me being arrested on Operation Beach Apple?  Something
definitely does not make sense here.  This is why I asked for
the subpoenas and the information on the summary report plan,
the FBI sting, that's why I asked for all that redacted
information, but it was not given to me.

        The date prepared for Operation Beach Apple was on
June 16, and it ended on June 18.  That leaves me to question
if Operation Beach Apple was even authorized in June.  Also,
it came to my attention that Prosecutor Burns was reprimanded
on something to do with my sting.  That's why I asked for her
information.  I have sent motions for more information on
Beach Apple June 2020, subpoenas which I sought through the
Freedom of Information Act I was entitled to; however, I have
been denied my motion and I haven't heard anything about the
subpoenas, but I did hearing something today.

        THE COURT:  Mr. Zeller, how many more pages do you
have?

1          DEFT. ZELLER:  Last one, Your Honor.  Sorry, and

2     thank you.

3          THE COURT:  Okay.

4          DEFT. ZELLER:  With evidence fabrication and

5     tampering on a broad scale by the Government, I call into

6     question the prosecution's commitment to fair and just

7     enforcement of the law.  The intentional and systematic

8     prosecution misconduct deprived the Defendant of a fundamental

9     fairness at trial, given the nature of offenses against

10    children and repugnant allegations involve Defendants' rights

11    are often overlooked by Courts in the country.  Serious

12    misconduct by the prosecutor occurred during this

13    investigation phase of my case, but this Court refused to

14    adequately address it due to charges.

15         This Court additionally refused to adequately address

16    ineffective of assistance of Counsel from several attorneys

17    assigned to my case whom acted as if I didn't deserve an

18    adequate counsel due to the charges.  The Sixth Amendment

19    right to the constitution is the right to effective assistance

20    of counsel.  The right to effective assistance of counsel is

21    the right of the accused to require as a prosecution case to

22    survive the crucial and meaningful adversarial testings.  See

23    *United States v. Cronic*.  No matter what crime a Defendant has

24    allegedly committed, the Sixth Amendment to the U.S.

25    Constitution guarantees that he or she is afforded a proper

1    defense, even if he or she is accused of a sex offense.

2            Attorneys in my case were allowed to do the bare

3    minimum and not what's properly required to defend my case.

4    One, attorney assigned to my case refused to investigate

5    evidence; two, attorneys refused to properly prepare and mount

6    defense; three, trial counsel was unprepared for trial and

7    made minimal adversarial challenges; four, Attorney John

8    Stobbs told me in his August 23, 2022 letter that, "The only

9    decision you get to make is whether or not you will take the

10   stand, is if you will testify."  The American Bar Association

11   Standards of Criminal Justice 4-5.2 reminds lawyers that

12   certain fundamental decisions are for the clients and not

13   lawyers to make after adequate consultation.

14           Attorneys' failure to highlight evidence that could

15   prove Defendant's theory of the case prejudiced me at trial.

16   In this conclusion, as I stand here with my life in the

17   balance, I simply ask this Court to consider what it would

18   want done if I were a family member or if the shoe was on the

19   proverbial other foot.  And I leave the Court with these last

20   six words:  With liberty and justice for all.

21           THE COURT:  All right.  Thank you, Mr. Zeller.  So,

22   you were obviously very prepared for the allocution and I

23   appreciate that.  It took you about 32 minutes to read that.

24           DEFT. ZELLER:  I'm sorry, Your Honor.

25           THE COURT:  No, that's okay.  I have all the time.

1    But, in that time you never really addressed what is an

2    appropriate sentence.  You are attacking the facts and the

3    trial record; I understand that.

4           What do you think is an appropriate sentence in this

5    case?

6           DEFT. ZELLER:  I don't know.  That's your job to

7    decide that, Your Honor.  I can't really say.  I mean,

8    everything I know is the truth.  I asked for evidentiary

9    hearings to prove it through multiple Counsels.  And I get

10   when I asked you, by that time you said the investigation was

11   phased, but, Your Honor, I asked for this multiple times;

12   multiple times.

13          THE COURT:  Okay.  I get it.  That still, again, goes

14   to the facts.

15          DEFT. ZELLER:  I'm sorry.  If we would have had this

16   evidentiary hearing, I wouldn't be getting sentenced today.  I

17   guarantee you that.

18          THE COURT:  Okay.  Are there any recommendations that

19   you would like me to make to the Bureau of Prisons with

20   respect to placement or programming?

21          DEFT. ZELLER:  That's something that I don't even

22   know anything about, because I was never discussed that with

23   counsel.  Like --

24          THE COURT:  Okay.

25          DEFT. ZELLER:  -- I think that I am supposed to be

1    going to a low, due to my points is only like 11 or 13,

2    because no criminal history, I have a GED, my age level, stuff

3    like that.

4            THE COURT:  Okay.  Well, I can make a recommendation,

5    so that's why I asked if you had any.  They don't have to

6    follow it, so it doesn't really matter, because the

7    designation process is very complicated.  But, you know, if

8    you had a particular facility you wanted me to recommend, I

9    would.

10           DEFT. ZELLER:  Whatever low is close around here, I

11   guess.

12           THE COURT:  Okay.  Well, they do try to keep you

13   close to family.

14           All right.  Thank you, Mr. Zeller.

15           I'm going to start first with addressing the

16   allocution, which, as I said, the purpose of which is to offer

17   mitigating evidence.  So, Mr. Zeller essentially continues to

18   attack the evidence and the facts in the case saying that the

19   chat with the 16-year-old was fake, even though he admits that

20   he chatted with this person and admits that she told him she

21   was 17, and yet he sent a picture.  He challenges the

22   Government's reliance on the prior sex offense, noting that he

23   was found not guilty on one charge and that the other was

24   changed to a battery.  He attacks the letter from the victim

25   in the Florida case, which, again, the burden of proof is very

1    different at sentencing.  That person was deposed.  The

2    conduct is very similar to here.

3            Now, Mr. Zeller, you can raise all your

4    constitutional and Civil Rights arguments on appeal, as well

5    as any -- as well as any factual disputes, but at the end of

6    the day all of the allocution, just essentially constantly

7    blaming the victim, blaming the lawyers, blaming me, blaming

8    everyone, but never accepting any ounce of responsibility.

9            Interestingly, Mr. Zeller seems to admit that he

10   often chats with people online.  He always thinks they are

11   fake, but yet he keeps doing that.

12           DEFT. ZELLER:  Not everybody, Your Honor.

13           THE COURT:  No, you are done.  Your allocution has

14   ended.

15           So, even in the allocution, again, he just wants to

16   attack the facts and the victims.  Preposterously he thinks

17   that the person they used -- that the FBI used in the chat was

18   the Assistant United States Attorney Burns, which absolutely

19   makes no sense.  He wants to attack the post-arrest interview,

20   but we all heard that interview at trial and the interview and

21   the related documentation will be -- are a part of the record.

22   Now he claims he was under the influence at the time, and,

23   again, I heard the evidence and there was no sign of that

24   during the interview.

25           Now, Mr. Zeller has had initially a Federal Public

1    Defender, then Attorney Dan Juengel, who, in my personal

2    opinion, is one of the finest Criminal Justice Act lawyers we

3    have on the panel; and then John Stobbs, who I would put right

4    at the same level as Mr. Juengel.  And then Mr. Campanella,

5    the record will reflect, was brought in to assist Mr. Stobbs.

6    Mr. Stobbs did take the lead at trial.

7            Now, in allocution, Mr. Zeller wants to raise the

8    entrapment defense.  That is a legal issue that was addressed

9    at trial.  He wants to attack his adult decision not to

10   testify.  I gave him extensive time to discuss that with

11   counsel.  I explained that it was his choice and not counsel's

12   choice, so all of that will be reflected in the record.

13           The record will also reflect that at the time one of

14   the factors that went into that consideration of whether he

15   would testify was that the Government had the two young women

16   from Florida here who would have been allowed to testify had

17   Mr. Zeller taken the stand.

18           Turning then to the Government's arguments, they

19   point out that just one prior offense of sexual activity would

20   get the enhancement, and here there are four.  I recognize

21   that Congress anticipated that in certain cases life may be

22   appropriate on Count 1, that is the Attempted Enticement of a

23   Minor.

24           The Government really doesn't point to any mitigating

25   evidence, either, which they sometimes do when there is.  But,

1  of course, Mr. Zeller doesn't point anything mitigating other

2  than attacking the facts and everyone in the case.

3          It is concerning that this behavior that is the

4  offense of conviction occurred when he was in his 40s, quite a

5  while after the Florida alleged incidents.  There's evidence

6  on the phone with the chat, which we already talked about, in

7  2019.  The letter that was received from the victim chronicles

8  lifelong lasting effects that this had on her.  She's now an

9  adult, and yet this is something that one deals with forever.

10          But for the FBI intervening, the FBI being the person

11  with whom Mr. Zeller was texting, he likely would have had sex

12  with yet another minor.  The fact that he didn't knock on the

13  door and was arrested has absolutely nothing to do with

14  anything.

15          The Government used the word *obstinate,* I think that

16  is an excellent word, and manipulative certainly a word to

17  describe Mr. Zeller.  Again, I saw and heard all of the text

18  messages at trial and the record will reflect that.

19          The Sentencing Commission data is interesting.  Often

20  in many cases I will find that, you know, as someone ages they

21  are likely to not commit crimes, that being usually --

22  especially true in drug cases, I believe.  But, if someone

23  likes to have sex with little girls, that doesn't go away the

24  older that you get.

25          And I just want to touch on, again, Mr. Zeller

1    doesn't have any criminal history points.  There's a

2    difference between a Defendant who has no criminal history

3    points and a Defendant who has absolutely no criminal history.

4    And Mr. Zeller certainly has a criminal history, just not any

5    points in the way that the guideline calculations are made.

6         Now, as I said at the beginning of the hearing, in

7    determining what is an appropriate sentence I have to

8    determine what will reflect the seriousness of the offense,

9    promote respect for the law, and provide just punishment.

10    Those often go hand in hand with one another; what will afford

11    specific deterrence to Mr. Zeller; what will afford a general

12    deterrence to the extent that there is such a thing that the

13    public sees that this type of crime is made -- is taken very

14    seriously; what will protect the public from further crimes

15    and what will provide the Defendant with needed education or

16    vocational training, medical care, or other corrective

17    treatment.  And I will address that in a minute.

18         But, after considering all of these factors, I am

19    going to impose a high-end guideline sentence of 405 months.

20    I am going to impose a lifetime term of supervised release.

21    That is, let me make it very clear, because Mr. Zeller has

22    proven to be manipulative, I believe he is sociopathic, again,

23    obstinate, and, perhaps most significantly, completely lacking

24    in remorse.  And, of course, after this length of imprisonment

25    he will need a lot of support at the age he will be to

1    reintegrate into society.

2          So, I am going to only impose the mandatory and

3    administrative conditions because of the length of the

4    sentence.  Some probation officer at some other time can

5    determine what would be appropriate special conditions to

6    impose.

7          I'm going to impose a fine of $1,500, that being $500

8    on each count.  That is well below the guideline range, but

9    certainly can be paid off during the term of imprisonment and

10   will allow Mr. Zeller to have a job, work in BOP, hopefully

11   learn a vocational skill, and he can make payments.

12         So, again, I find that the sentence at the high end

13   of the guideline range is warranted in this case.  And, I

14   should say 405 months on Count 1, 360 on Counts 2 and 3, to

15   run concurrently.  That is because of the statutory maximum.

16   But, I think this sentence is appropriate to reflect the

17   seriousness of this offense, promote respect for the law,

18   provide just punishment, and afford specific deterrence to Mr.

19   Zeller.  This is particularly true considering that the

20   conduct in this case which involved attempting to engage in

21   sexual activity with a purported 15-year-old minor after

22   corresponding with her on a dating application, he managed --

23   or messaged the purported minor for four -- over four days,

24   from June 23rd to June 26th, manipulatively, as the Government

25   argues in its sentencing memo, to gain her trust.  He was

1    bragging about his sexual abilities, graphically discussing

2    sexual acts and language and requesting sexual pictures from

3    the minor.  He then traveled from Missouri to here in the

4    Southern District of Illinois to engage in sexual activity

5    with who he thought was a 15-year-old girl.

6         Now, I recognize that the offense of conviction was

7    not a hands-on offense because he was chatting with the FBI,

8    not a real 15-year-old, but he does have a history of hands-on

9    offenses with minors.  As mentioned, in January of 1999, which

10   I note is almost 25 years ago, he was charged with two counts

11   of lewd and lascivious assault or act upon a child.  I

12   recognize he was found not guilty at trial, but the victim

13   gave sworn testimony that he had sex with her on two occasions

14   when she was just 13 years old.  The Court also received a

15   letter from the victim which we have talked about which

16   recounts her emotional and psychological struggles since that

17   time because of what Mr. Zeller did to her.

18        Now, again, preponderance of the evidence at

19   sentencing -- Certainly there is a preponderance of the

20   evidence to reflect Mr. Zeller's background and character.

21   Sadly, that wasn't the only one.  In February of 1999, he was

22   charged with having sexual intercourse with a different

23   13-year-old.  And when the cell phone was seized following his

24   arrest in this case, authorities found evidence of a

25   sexually-explicit conversation with a 16-year-old girl that

 1  took place in 2019.  Apparently his only explanation of all of

 2  this is that he didn't think anybody was real.  But, certainly

 3  these prior incidents show a pattern of dangerous predatory

 4  conduct.  In considering his history, I simply find the nature

 5  and circumstances of the offense are far more serious than

 6  they might otherwise be.

 7       I have had a number of these Attempted Enticement of

 8  a Minor cases, and I have often given the mandatory minimum

 9  required by statute because there's no evidence of any other

10  criminal conduct.  But here, in light of everything in the

11  record, I find there is a crucial need to protect the public

12  from Mr. Zeller.

13       In addition to his history and characteristics, he

14  has shown, as I have said several times already today, a

15  complete lack of remorse for acceptance of responsibility.

16  He's in denial about his legal situation and has shown, quite

17  honestly, a stunning inability to accept responsibility for

18  his actions, despite the overwhelming evidence of his guilt,

19  including his post-arrest confession.  He has blamed everyone

20  involved in the case, including the United States Attorney's

21  Office, the FBI, his attorneys, and the social media companies

22  that he used to entice a minor, rather than accept that he

23  committed a crime and was caught.  He has even attempted to

24  place blame on the Court by insisting that I played an

25  integral role in the development and implementation of

1    Operation Beach Apple; that, of course, being the FBI sting

2    that led to his arrest.  The Court certainly has nothing to do

3    with investigations led by the FBI or the United States

4    Attorney's Office, and certainly didn't have any involvement

5    in June of 2020.

6         To that end, as I mentioned earlier, he's tried to

7    change venue claiming I am biased and he's filed a civil

8    lawsuit, he's trying to name me in that, he has named the

9    prosecutor, all of this as part of his manipulation

10   techniques.  His arrogance and sense of entitlement is quite

11   astounding to the Court.  Rather than realize that his

12   attorneys did what he demanded them to do, that being subpoena

13   Kick and MeetMe, hire an expert -- which we have heard a lot

14   of that and the record will reflect all of that history -- he

15   lashed out at the attorneys and called them ineffective when

16   the results of those efforts were unfavorable to him.

17        While the Court can see through some of the bravado,

18   perhaps, the issue of protecting the public here is very real

19   and so is the need for specific deterrence.  If charges almost

20   25 years ago did not deter him from preying on minor girls

21   even as he should have matured, the Court is concerned that

22   anything less than a significant term of incarceration and the

23   resulting incapacitation will not deter him, either.  His

24   ongoing behavior, even after being found guilty by 12 members

25   of a jury, demonstrates a complete lack of respect for the

law.

Again, I touched on the Government's pointing to evidence that the rate of sex offenses increases as offenders age, specifically over the age of 70.  This sentence is also comparable to those imposed on other offenders who were repeat dangerous sex offenders against minors.  Again, one prior incident would get the enhancement, and there are several here.

I have attempted to consider everything that would be mitigating, even though none of this was addressed in Mr. Zeller's argument or allocution.  But, the Court is mindful that he has a minor son whom he will be separated from for the child's entire childhood, but that fact alone does not justify anything less than a guideline sentence.  And while he's never served any significant period of time before his arrest in this case and often the Court will find that a lesser sentence is appropriate for Defendants who have never been to prison, I'm still concerned about the need to protect the public, which I have just discussed.

The Court also wants to acknowledge, as I did going over the nature and circumstances and his history and characteristics, his childhood was rough.  He had no father figure, his mother was addicted to crack cocaine and he was physically abused.  But, sadly, those unfortunate circumstances likely led to his current personality, which I

1    think there is a personality disorder there, his mental health

2    issues, and substance abuse.  This victim mentality of always

3    blaming the victim, the lawyers, the Court, the prosecutor

4    simply will not serve him well in prison, and I do find he

5    certainly would benefit from mental health and substance abuse

6    treatment and I am going to make that recommendation to the

7    Bureau of Prisons.

8              Now, something even more than the high end of the

9    guideline range might be appropriate in this case in light of

10   all the aggravating factors.  Again, Congress did allow for a

11   life sentence to be imposed for a conviction under the

12   statute, but this sentence will still give Mr. Zeller the

13   chance to get out of prison in his 70s, if he rehabilitates

14   and quits the victim mentality and focuses on becoming a

15   better person.  So, I think anything more than the high-end

16   guideline range would likely be greater than necessary to

17   achieve the goals of sentencing, but anything less -- And I

18   will note even if the guideline range is incorrect, I threw

19   the guideline range out.  I don't think anything less than 405

20   months would meet the sentencing goals of 18 U.S.C. 3553 for

21   all the reasons that I have stated.  And, I have said why I am

22   imposing a lifetime of supervised release, so that will be

23   imposed, as well.

24             So, pursuant to the Sentencing Reform Act of 1984, it

25   is the judgment of the Court that the Defendant, Vallie

1    Francis Zeller, is committed to the custody of the Bureau of

2    Prisons to be imprisoned for a term of 405 months on Count 1,

3    360 months on Counts 2 and 3, to run concurrently.

4           Now, Mr. Zeller, you will have to pay to the United

5    States a special assessment of $300.  That's payable through

6    the Clerk of the United States District Court.  As I found

7    earlier, Mr. Zeller is indigent, does not have the ability to

8    pay the additional $5,000 special assessment.  As I said, I'm

9    going to impose a total fine of $1,500.  That's $500 on each

10   count.  That is also payable through the Clerk of the United

11   States District Court and is due immediately.

12          Now, you will need to notify the United States

13   Attorney for this district within 30 days of any change of

14   name, residence, or mailing address until all of the financial

15   penalties are paid in full.  Having assessed your ability to

16   pay, payment of the total criminal monetary penalties shall be

17   paid in equal monthly installments of $25 or ten percent of

18   your net monthly income, whichever is greater.

19          Upon release from imprisonment you will be placed on

20   supervised release for a term of life on each count to run

21   concurrently.  Within 72 hours of release from the custody of

22   the Bureau of Prisons, you shall report in person to the

23   United States Probation Office in the district where you are

24   released.

25          In addition to the sentence imposed, you shall

1  forfeit interest in the phone that was the subject of the

2  Preliminary Order of Forfeiture entered earlier this week.

3        Now, as I said earlier, I am only going to impose the

4  mandatory and administrative conditions due to the length of

5  the sentence and it's hard for me to know what might be

6  appropriate when Mr. Zeller is released.

7        Now, Mr. Zeller, the presentence report included

8  those mandatory and administrative conditions.  Again, I'm not

9  going to impose any special conditions.  I asked you at the

10 beginning if you had read them and you told me that you had.

11 Do you remember that?

12       DEFT. ZELLER:  I do, but I'm not exactly sure what

13 they were at this point.

14       THE COURT:  Well, that leads me to my next point.

15 The Court of Appeals says I should read them all to you in

16 open court, kind of a formal reading of the Conditions of

17 Supervision.  I am happy to do so.  That is something that you

18 can waive, because they will be included in the judgment that

19 I sign, and before they take effect someone will come and go

20 over them with you.  So, if you want to waive that formal

21 reading, I have a waiver here we can hand to you.  If you want

22 me to read them, I will.

23       DEFT. ZELLER:  You don't have to read them, but I'm

24 not signing anything from this Court.  But, you don't have to

25 read them.  I'm not signing nothing.

1           THE COURT:  Well, let me just go through them --

2           DEFT. ZELLER:  Last time I signed a paper --

3           THE COURT:  Okay.  I said earlier you are not going

4    to talk over me.

5           DEFT. ZELLER:  Yes, ma'am, I apologize.

6           THE COURT:  It's just the waiver of the reading.

7    But, I'm going to read them, just go over them.  The

8    explanation is in the presentence report.  These are all

9    conditions that are required by statute.

10          While on supervised release you shall not commit

11   another federal, state, or local crime; you shall not

12   unlawfully possess a controlled substance; you shall refrain

13   from any unlawful use of a controlled substance; you will have

14   to submit to one drug test within 15 days of release from

15   imprisonment and at least two periodic drug tests thereafter

16   as determined by the Court, not to exceed 52 tests in one

17   year; you shall cooperate in the collection of DNA as directed

18   by the probation office; you will have to comply with the

19   requirements of the Sex Offender Registration and Notification

20   Act as directed by the probation officer, the Bureau of

21   Prisons, or any state sex offender registration agency in the

22   location where you live, work, are a student, or where

23   convicted of a qualifying offense;

24          As I already said, you must report to the probation

25   office in the district where you are released within 72 hours

1    of release from the custody of the Bureau of Prisons; you

2    shall not knowingly possess a firearm, ammunition, or

3    destructive device; you shall not knowingly possess a

4    dangerous weapon unless approved by the Court; you shall not

5    knowingly leave the federal judicial district without the

6    permission of the Court or the probation officer; you shall

7    report to the probation officer in a reasonable manner and

8    frequency directed by the Court or probation officer; you

9    shall respond to all inquiries of the probation officer and

10   follow reasonable instructions of the probation officer; you

11   shall notify the probation officer prior to an expected change

12   or within 72 hours after an unexpected change in residence or

13   employment; you shall not knowingly meet, communicate, or

14   otherwise interact with a person whom you know to be engaged

15   or planning to be engaged in criminal activity; you shall

16   permit a probation officer to visit you at any -- at a

17   reasonable time at home or at any other reasonable location,

18   and shall permit confiscation of any contraband observed in

19   plain view of the probation officer; you shall notify the

20   probation officer within 72 hours of being arrested or

21   questioned by law enforcement.

22        And that concludes the mandatory and administrative

23   conditions, and I find that those are appropriate simply

24   because they are mandatory or otherwise necessary for

25   supervision.

1          I will find that Mr. Zeller is unable to pay the cost

2    of incarceration or supervision, and they are waived.

3          Ms. Burns, do you request any further explanation of

4    the reasons for my sentence or anything else at this time?

5          MS. BURNS:  No, Your Honor.

6          THE COURT:  Mr. Zeller, do you request any further

7    explanation of the reasons for my sentence?

8          DEFT. ZELLER:  Just why I was never awarded an

9    evidentiary hearing would be great.

10         THE COURT:  Okay.  Well, you can take that up on

11   appeal.  I would like to think I addressed all the arguments

12   in mitigation, although Mr. Zeller did not make any

13   mitigation, that I have considered everything that could

14   arguably be mitigating.

15         Now, Mr. Zeller, you can appeal both your conviction

16   and your sentence.  As you are proceeding *pro se*, we have a

17   Notice of Appeal for you here.  If you would like to sign this

18   and have the Clerk file it on your behalf at this time, we can

19   get that filed just immediately after I enter judgment.

20         Would you like to take a look at this and sign this

21   Notice of Appeal?

22         DEFT. ZELLER:  Can I take it with me and decide what

23   I want to do?

24         THE COURT:  Sure, you can mail it in.

25         DEFT. ZELLER:  Can I ask you a question about this?

```
 1              THE COURT:  Yes.

 2              DEFT. ZELLER:  Who would be assigned to me?  Someone

 3    else that doesn't like sex cases or someone that's really

 4    going to try to help me?

 5              THE COURT:  You mean counsel on appeal?

 6              DEFT. ZELLER:  Yes.

 7              THE COURT:  That's up to the Court of Appeals.  They

 8    will assign -- They have similar to what we have, a panel.

 9    They have a panel of attorneys that handle that.  So, you can

10    take that Notice of Appeal -- I don't know who they are.  That

11    will be handled by the Court of Appeals.

12              DEFT. ZELLER:  Who hears it?  What district does it

13    go to?

14              THE COURT:  So, it goes to the Seventh Circuit Court

15    of Appeals which sits in Chicago.  There are judges from

16    Illinois, Indiana, and Wisconsin.  They pick a panel of three.

17    That is a random assignment and that isn't picked until the

18    time the case is presented for oral argument or presented for

19    decision.

20              So, you have that Notice of Appeal.  Now, I have to

21    -- This is very important.  Any notice of appeal must be filed

22    within 14 days of judgment being entered in your case or

23    within 14 days of the Government filing a notice of appeal.  I

24    expect I will enter judgment this afternoon, certainly

25    tomorrow at the latest.  So, it's important that if you wish
```

1    to appeal, you sign that form or you can write it out on your

2    own if you don't want to use the court's form, but make sure

3    that it gets filed in this court, you send it to this court,

4    and I know you know how to do that, within 14 days.  Do you

5    understand that?

6          DEFT. ZELLER:  Yes, ma'am.

7          THE COURT:  And if you are unable to afford the

8    services of a lawyer to handle your appeal, a lawyer will be

9    appointed for you by the Court of Appeals.  Do you understand

10   that?

11         DEFT. ZELLER:  Yes, ma'am.

12         THE COURT:  And, if you need a transcript of the

13   record in the case, a Court Reporter has taken down everything

14   that's been said in every hearing you have had and all

15   throughout trial.  If you need that for an appeal and can't

16   afford, it you can get it for free.  Do you understand that?

17         DEFT. ZELLER:  I'm sorry.  I can have the transcripts

18   now, but I couldn't have them before?

19         THE COURT:  If you need a transcript of the record

20   for an appeal, you can get them at the Government's expense.

21         DEFT. ZELLER:  That means if I am doing it myself or

22   if I am getting an attorney?  How's that --

23         THE COURT:  Either way, you have a right to get the

24   transcripts.

25         DEFT. ZELLER:  Okay.

1           THE COURT:  Ms. Freeman, anything I have overlooked?

2           PROBATION OFFICER:  No, Your Honor.

3           THE COURT:  Ms. Burns, anything else?

4           MS. BURNS:  No, Your Honor.

5           THE COURT:  Mr. Zeller, anything else?

6           DEFT. ZELLER:  I wouldn't know.  I believe not.

7           THE COURT:  All right.  There being nothing further

8    before the Court, the Defendant is remanded to the custody of

9    the United States Marshals Service and the Court's in recess.

10          COURT SECURITY OFFICER:  All rise.

11          (Proceedings adjourned at 12:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                        *   *   *   *   *   *   *

3       I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

4    Reporter for the U.S. District Court, Southern District of

5    Illinois, do hereby certify that I reported with mechanical

6    stenography the proceedings contained in pages 1-78; and that

7    the same is a full, true, correct and complete transcript from

8    the record of proceedings in the above-entitled matter.

9

10   */S/ Stephanie K. Rennegarbe,*              11/29/2023
     IL CSR, RDR, CRC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25